*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0091**

In the Matter of the Determination of the Need for an Environmental Impact Statement for the Mankato Motorsports Park.

**Filed November 27, 2023**
**Reversed and remanded**
**Cochran, Judge**

City of Eagle Lake
Resolution No. 2022-46

David M. Robbins, Marshall H. Tanick, Meyer Njus Tanick, PA, Minneapolis, Minnesota (for relators Citizens Against Motorsports Park (CAMP), Michael Guentzel, Erin Guentzel)

Paul Donald Reuvers, Andrew A. Wolf, Iverson Reuvers, Bloomington, Minnesota (for respondent City of Eagle Lake)

Bradford Development, Mankato, Minnesota (respondent)

Considered and decided by Cochran, Presiding Judge; Johnson, Judge; and Klaphake, Judge.*

**NONPRECEDENTIAL OPINION**

**COCHRAN**, Judge

In this certiorari appeal, relators challenge respondent's decision that an environmental impact statement (EIS) is not needed for a proposed motorsports park (the project) following a remand by this court. *See In re Determination of Need for Env't*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

*Impact Statement for Mankato Motorsports Park*, No. A20-0952, 2021 WL 1604359, at \*1 (Minn. App. Apr. 26, 2021) (*CAMP I*). Relators argue that respondent's determination that the project does not have the potential for significant environmental effects is arbitrary, capricious, and unsupported by substantial evidence because the respondent inadequately considered (1) impacts to wildlife and (2) cumulative potential effects. Because respondent's determination regarding impacts to wildlife is not supported by substantial evidence and respondent failed to adequately consider the potential cumulative impacts from greenhouse gas (GHG) emissions resulting from the project, we reverse and remand for a new determination on the need for an EIS.

## FACTS

Respondent Bradford Development (the developer) proposes to construct the Mankato Motorsports Park in the city of Eagle Lake.[1] Respondent City of Eagle Lake (the city) is the responsible government unit (RGU) charged with determining what level of environmental review is required for the project. *See* Minn. R. 4410.0200, subps. 75-76 (defining "responsible government unit" and "RGU"), .4300, subp. 36.A. (requiring an EAW for the conversion of 80 or more acres of agricultural land and designating the local governmental unit as the RGU) (2021).

The project site encompasses approximately 230 acres of agricultural land, most of which is farmland but some of which contains wetlands. The project site is adjacent to the southeastern shore of Eagle Lake, a designated wildlife lake, and is bounded on the

---

[1] The developer has not filed a brief with this court.

southern side by U.S. Route 14, a four-lane highway with a 65 mile-per-hour speed limit. *CAMP I*, 2021 WL 1604359, at *1. The project site is also near the Mankato Regional Airport. The developers located the project near the airport because the project is intended to be a "destination course."

The project would include a three-mile track for high-performance vehicles, a track clubhouse, car condos,[2] associated parking lots, a hotel, and a golf entertainment center.[3] *Id.* The track would be a private club for members "to drive at their desired pace in order to experience the optimal performance of their automobiles." *Id.* The track also would be available to the public during "driving events, including performance driving schools, teen driving school, and exotic car rentals." *Id.* The track would be open seasonally from April through October.

Because the project would convert approximately 230 acres of agricultural land to industrial use, the project required an Environmental Assessment Worksheet (EAW) to determine whether a full EIS is required for the project. *Id.*; Minn. R. 4410.4300, subps. 1, 36 (2021). As the RGU, the city was responsible for complying with the EAW process and hired a consultant to prepare an EAW. *CAMP I*, 2021 WL 1604359, at *1; Minn. R. 4410.4300, subps. 1, 36. Based on the EAW and related public comments, the city council

---

[2] Based on the EAW, "car condos are multi-unit 'seasonable living areas' that include a garage." *CAMP I*, 2021 WL 1604359, at *1 n.2. While car condos are not residences, they do provide storage for cars as well as amenities for car owners. *Id.*

[3] In response to comments on the EAW, the city explained that the hotel and golf entertainment center were "no longer being considered as part of this development." *CAMP I*, 2021 WL 1604359, at *1-2. The city confirmed this position in its second decision on the need for an EIS.

determined that the project did not have the potential for significant environmental effects and therefore an EIS was not required for the project to move forward. *CAMP I*, 2021 WL 1604359, at *2.

Relators Citizens Against Motorsports Park (CAMP), Michael Guentzel, and Erin Guentzel appealed the city's initial negative declaration on the need for an EIS, arguing that the city's decision was arbitrary and capricious and unsupported by substantial evidence. *Id.* at *1. This court concluded that substantial evidence supported the city's determination that an EIS was not required to address "noise impacts on humans, waste storage and disposal, land alterations, and wetlands." *Id.* But, because the city "did not rely on substantial evidence to determine whether the project would have the potential for significant effects on wildlife and failed to address agency and county concerns about the potential for cumulative effects from greenhouse gas emissions," we reversed and remanded "for a new determination on the need for an EIS." *Id.* Regarding wildlife, we specifically noted that "the record contains no evidence about the project's effect on wildlife because there was no attempt to identify, survey, or catalog the wildlife in the project area." *Id.* at *7.

*Supplemental EAW*

Following our decision, the city's consultant prepared a supplemental EAW to further evaluate whether the project has the potential for significant environmental effects. Below, we summarize the supplemental EAW's analysis of the project's potential impacts on wildlife and the project's potential for cumulative effects from GHG emissions.

4

Potential Effects on Wildlife

Regarding the 230-acre project site itself, the supplemental EAW considers the potential impacts on wildlife in very general terms and does not identify or list the wildlife that use or inhabit the project site. The supplemental EAW notes that wildlife in the project area may be disturbed by the construction and by "human activity and noise associated with the proposed road course and associated development." The supplemental EAW also states that "[m]ost of the wildlife species in the study area already tolerate some measure of human activity along the project corridor." And the supplemental EAW concludes that the project "is expected to have little effect on wildlife resources found in the project area since the entire project is located within an existing agricultural field." But the supplemental EAW reaches this conclusion without listing or identifying the wildlife species that use or inhabit the project site.

With regard to wildlife in the vicinity of nearby Eagle Lake, the supplemental EAW does identify some of the wildlife species that may use or inhabit the lake. The supplemental EAW explains that Eagle Lake, a designated "wildlife lake," is a shallow lake and that "shallow lakes provide important habitat for waterfowl, other water birds, fur-bearing mammals, amphibians, reptiles and fish," as well as breeding grounds for over-water nesting waterfowl. The supplemental EAW also identifies individual species that have been known to visit or inhabit Eagle Lake in the past, using information from two resources: (1) Department of Natural Resources (DNR) surveys of south Eagle Lake (conducted in 2003 and 2010) and Eagle Lake as a whole (conducted in 1953, 1970, 2002, and 2011), and (2) a U.S. Fish and Wildlife Service (USFWS) "screening" of species under

5

its jurisdiction. But the supplemental EAW specifically recognizes that the DNR surveys "do not provide an exhaustive list of all species that may use Eagle Lake" because the surveys were conducted on a single day in each of the relevant years—the most recent of which was 2011. And the USFWS screening identifies only two migratory birds—the Bald Eagle and the Lesser Yellowlegs—as being in or near the project area.[4]

In addition to identifying these species, the supplemental EAW discusses the potential effects on Eagle Lake wildlife. The analysis focuses primarily on the potential impacts to waterfowl from noise that would be generated by the project. The supplemental EAW notes that a second sound study was conducted in 2022 "to determine the increase in noise levels of the proposed track on Eagle Lake." The study considered the impact of noise from the proposed track and noise from the nearby highway. Based on the results of the study, the supplemental EAW concluded that the increase in noise from the project would be negligible and noise from the project "will not affect nesting waterfowl along the lake shore."

The supplemental EAW also addresses the potential effects from lighting associated with the project on wildlife. The supplemental EAW explains that the buildings and parking areas would be lighted in accordance with city ordinances but that the driving track would not be lighted. The supplemental EAW also notes that the project would not include

---

[4] The supplemental EAW stated that the Bald Eagle was most likely to be in the project area from January through April, while the Lesser Yellowlegs was most likely to be in the project area in March. The supplemental EAW also identified the Bald Eagle's breeding season as December through August.

flashing lights or shine lights into the sky. For these reasons, the supplemental EAW concludes that "[l]ighting is not anticipated to affect wildlife in or near the project area."

Lastly, the supplemental EAW acknowledges that human and vehicle traffic associated with the project could disturb some species, leading to relocation or possibly increased mortality for species less tolerant of the disturbances. But the supplemental EAW nevertheless concludes that such traffic likely would not affect wildlife.

Based on the foregoing information, the supplemental EAW concludes that the project will not increase "known wildlife disturbances to a level that will affect wildlife on Eagle Lake." "Therefore, an in-depth wildlife study of Eagle Lake was not conducted."

Potential Effects from Air Emissions

The supplemental EAW also considered the project's effects on "global climate change" primarily by estimating the project's annual GHG emissions. After evaluating (1) agricultural emissions data from 2008, (2) automobile emissions data from 2019, (3) facility operations emissions data from 2021, (4) water energy estimates, and (5) emission estimates from a similar motorsports park project in California, the supplemental EAW estimated that the project would increase GHG emissions in the area by 35,221.87 metric tons of carbon dioxide equivalent per year. Based on this estimate, the supplemental EAW concluded that the project's contribution to GHG emissions in the area would be "negligible" in light of other development and emphasized that its "incremental contribution to global GHGs cannot be translated into effects on climate change globally or regionally." The supplemental EAW did not consider whether the

project would increase air travel to and from the Mankato Regional Airport and therefore did not include emissions from air travel in its emissions estimate.

*Public Comments and Responses*

The supplemental EAW was published in the Environmental Quality Board Monitor on September 20, 2022. The 30-day public-comment period ran from September 20, 2022 to October 20, 2022, pursuant to Minn. R. 4410.1700, subp. 2.A (2021).

During the public-comment period, the city received comments from 17 parties, including the U.S. Army Corps of Engineers, the Minnesota Department of Transportation (MnDOT), DNR, and 13 members of the public. On November 7, 2022, the city council voted to postpone "its EIS decision" until December 5, 2022, to give the developer an opportunity to "provide a response to all substantive comments which they have not yet provided." Below is a summary of the relevant comments and the developer's responses.[5]

DNR

With respect to wildlife impacts, the DNR expressed concerns about the supplemental EAW's reliance on the 2022 noise study and the DNR wildlife surveys. Starting with the noise study, the DNR stated that the noise modeling "does not appear to cumulate the effect of noise" from Highway 14 and the project. The DNR also expressed concerns that the noise study did not account for the change to ambient noise conditions throughout the year. In response, the developer stated that "[n]oise from highway and development cannot be cumulated." The developer also stated that "[n]oise propagates

---

[5] The comments from the U.S. Army Corps of Engineers and MnDOT were not substantive.

8

best under inversion conditions which typically occur at nighttime and early morning hours" and that the "[t]rack will not operate at night." Therefore, according to the developer, "maximum noise from the track typically is not at the same time as maximum noise from [the] highway."

Regarding the Eagle Lake wildlife surveys, DNR emphasized that the DNR surveys relied upon by the city in the supplemental EAW "illustrate a one-day visit and are not intended to provide a full picture of wildlife use from day to day or throughout the year." DNR recommended that "an in-depth wildlife use study (focusing on avian use) for the lake including nesting, migration, and other activities" be completed at "biologically relevant times." The developer responded by stating: "Current research indicates that noise is unlikely to be a factor on avian use and will unlikely change the findings of the EAW." The developer then cited a 2012 study titled: "Population, Behavioural and Physiological Responses of an Urban Population of Black Swans to an Intense Annual Noise Event." The developer did not address any other potential impacts to wildlife.

Lastly, with respect to GHG emissions, DNR stated that the supplemental EAW identifies the project as "a destination location for those traveling in from the local airport" but does not quantify how much increased air traffic would contribute to the project's overall GHG emissions. DNR asserted that "[emissions] from airplane travel are a significant source of [GHGs] and should be included in the analysis." In response, the developer stated that the "[p]roject is not anticipated to have an impact on adjacent airplane or railroad travel and therefore these emission levels should remain static regardless of the proposed project" but did not provide any support for this statement.

9

<u>Members of the Public</u>

Comments from members of the public addressed similar concerns as those expressed by DNR. One person with degrees in ecology and conservation biology and expertise in "avian ecology and wildlife management" specifically commented that the supplemental EAW erroneously excluded species that the person had observed recently in the project area. The developer "noted" this person's concerns.

*Second Negative EIS Declaration*

On December 5, 2022, the city council approved findings of fact and a decision on the need for an EIS. Based on the information generated through the supplemental environmental-review process, the city again concluded that the proposed project "does not have the potential for significant environmental effects" and that an EIS is not required. The city also concluded that "[a]reas where potential environmental effects have been identified . . . will be addressed" and that mitigation measures would be incorporated into the project design and permitting processes.

Relators now seek review by way of a petition for a writ of certiorari.

**DECISION**

The city's decision not to require an EIS is subject to review under the appeal provisions of the Minnesota Administrative Procedure Act—Minnesota Statutes sections 14.63-.69 (2022). Minn. Stat. § 116D.04, subd. 10 (2022); *In re City of Cohasset's Decision on the Need for an Env't Impact Statement for the Proposed Frontier Project*, 985 N.W.2d 370, 377 (Minn. App. 2023) (noting that this court applies the standards set forth in Minn. Stat. § 14.69 in its review of a negative EIS declaration). We may reverse

10

or modify the city's decision if it is, among other things, "arbitrary or capricious" or unsupported by substantial evidence. Minn. Stat. § 14.69. An RGU's decision is "arbitrary and capricious" if it "(1) is based on factors that the legislature did not intend for the RGU to consider; (2) entirely fails to address an important aspect of the problem; (3) offers an explanation that is counter to the evidence; or (4) is so implausible that it could not be explained as a difference in view or the result of the RGU's decision-making expertise." *Friends of Twin Lakes v. City of Roseville*, 764 N.W.2d 378, 381 (Minn. App. 2009). Stated differently, the RGU's decision is arbitrary and capricious if it "represents [the RGU's] will and not its judgment." *In re Denial of Contested Case Hearing Requests & Issuance of NPDES/SDS Permit No. MN0071013*, 993 N.W.2d 627, 646 (Minn. 2023) (quotation omitted). An RGU's decision is unsupported by substantial evidence if it is not supported by (1) "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;" (2) "more than a scintilla of evidence;" (3) "more than 'some evidence;'" (4) "more than 'any evidence;'" and (5) "evidence considered in its entirety." *CARD*, 713 N.W.2d at 832 (quotation omitted). The party challenging an RGU's decision bears "the burden of proving that its findings are unsupported by the evidence as a whole." *Friends of Twin Lakes*, 764 N.W.2d at 381.

Relators argue that the city's second negative EIS declaration is arbitrary, capricious, and unsupported by substantial evidence. Before turning to the merits of relators' arguments, we begin by summarizing Minnesota's environmental-review process.

11

### A.      Minnesota's Environmental-Review Process

Minnesota requires different types of environmental review depending on the nature of the project being proposed. *See, e.g.*, Minn. R. 4410.1000 (projects requiring an EAW), .2000 (projects requiring an EIS) (2021). If a project proposes to convert 80 or more acres of agricultural land to a different use, an EAW is required. Minn. R. 4410.4300, subp. 36.A. An EAW is "a brief document which is designed to set out the basic facts necessary to determine whether an environmental impact statement is required" for the proposed project. Minn. Stat. § 116D.04, subd. 1a(c) (2022).

By contrast, an EIS is a more "exhaustive environmental review," required when a project has the potential for significant environmental effects. *CARD*, 713 N.W.2d at 824; Minn. Stat. § 116D.04, subd. 2a(a) (2022). An EIS provides information to governmental units, the project proposer, and other interested parties so that they may evaluate the project, consider possible alternatives, and "explore methods for reducing adverse environmental effects." Minn. R. 4410.2000, subp. 1.

When an RGU is determining whether a proposed project has the potential for significant environmental effects and therefore requires an EIS, the RGU must consider: (1) the "type, extent, and reversibility of environmental effects"; (2) the "cumulative potential effects" of the project; (3) "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority"; and (4) "the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies," such as an EIS. Minn. R. 4410.1700, subp. 7 (2021).

The RGU must balance all four factors when deciding whether to require an EIS. *See CARD*, 713 N.W.2d at 825.

Here, the city determined that the project does not have the potential for significant environmental effects because: (1) the project "includes various measures to reduce adverse impacts to the environment and existing natural resources"; (2) "there are no known cumulative impacts"; (3) the project is subject to city, county, state, and federal laws, and the proposer will acquire all necessary permits and adhere to them; and (4) the project's environmental effects "can be adequately anticipated, controlled, and mitigated," in light of "the results of environmental review and permitting processes for similar projects."

## B.    Relators' Challenges to the City's Second Negative EIS Declaration

Relators argue that the city's second negative EIS declaration is arbitrary, capricious, and unsupported by substantial evidence because the city did not adequately consider the project's potential effects on wildlife or cumulative potential effects.[6] We agree.

### 1.    Wildlife

Relators contend that the city's determination that the project does not have the potential for significant effects on wildlife is arbitrary and unsupported by substantial evidence for two reasons. First, relators contend that the city made no attempt to catalog the species in the project area and instead relied on resources that provide "mere snapshots"

---

[6] We treat relators' arguments regarding the supplemental EAW as included within their challenge to the city's second negative EIS determination.

of wildlife in and around Eagle Lake.  Second, relators assert that the city did not adequately consider the project's potential effects on wildlife.  Relators specifically challenge "the validity of the noise studies" and echo DNR's concerns that the noise studies "do[] not appear to cumulate the effect of noise" from Highway 14 and the project on local wildlife.

The city argues that it reasonably determined that the project "would not significantly affect Eagle Lake wildlife."  The city notes that it conducted a supplemental noise study on Eagle Lake and that this study established that the project would not significantly affect local waterfowl, rendering an inventory of species unnecessary.  The city also asserts that its noise studies were valid and accurately modeled the cumulative effects of noise from Highway 14 and the project on wildlife.

In *CAMP I*, we concluded the city's negative declaration on the need for an EIS was unsupported by substantial evidence in part because the city made "no attempt to identify, survey, or catalog the wildlife in the project area."  *CAMP I*, 2021 WL 1604359, at *7-8. We conclude that the city's second negative EIS declaration suffers from the same deficiency.  Neither the EAW nor the supplemental EAW contain a complete discussion of the species that use or inhabit the 230-acre project site, a portion of which will be paved over to accommodate the track, track clubhouse, car condos, parking lots, and other elements of the project.  Likewise, neither the EAW nor the supplemental EAW provide a current or complete discussion of the species that use or inhabit Eagle Lake, a designated wildlife lake.  The supplemental EAW does list some species that have been observed in or near Eagle Lake in the past, but it does not identify the species currently known to use

14

or inhabit the area. Without knowing which species use or inhabit a project area, an RGU cannot ascertain the "type, extent, and reversibility of environmental effects" on wildlife in that area. Minn. R. 4410.1700, subp. 7. And without knowing a project's environmental effects on wildlife, an RGU cannot determine whether the project has the potential for significant environmental effects. *See id.*; *CARD*, 713 N.W.2d at 825. Accordingly, the city's determination that the project does not have the potential for significant effects on wildlife is arbitrary and not supported by substantial evidence.

We are not persuaded otherwise by the city's argument that it was not required to catalog the species in the project area because the supplemental noise study suggests that the project would not have any effect on birds residing in or near Eagle Lake. We reject this argument for two reasons. First, the supplemental noise study focused only on the potential effects of *noise* on wildlife—it did not consider other potential effects, such as habitat loss from the construction and use of the three-mile track, the track clubhouse, the car condos, and the associated parking lots. Second, the supplemental noise study centered on the potential effects of noise from the project on waterfowl alone, rather than all the species in the project area. Thus, the city's reliance on the supplemental noise study is unavailing.

We also note that, while we did not expressly require the city to catalog the species in the project area in *CAMP I*, we did indicate that the city's decision on the need for an EIS would lack substantial evidence if the city failed to "attempt to identify, survey, or catalog the wildlife in the project area." 2021 WL 1604359, at *7. Because the city neglected to identify the species that use or inhabit the project area on remand, it did not

15

take the necessary "hard look at the problems involved," nor did it "genuinely engage[] in reasoned decision-making." *CARD*, 713 N.W.2d at 832 (quotations omitted). We therefore conclude that the city lacks substantial evidence to support its determination that the project does not have the potential to significantly affect wildlife and that the determination is arbitrary and capricious.[7]

## 2. Cumulative Potential Effects

Relators argue that the supplemental EAW fails to fully address the cumulative potential effects of GHG emissions associated with the project. This argument is persuasive.

As discussed above, an RGU must consider the "cumulative potential effects" of a proposed project when determining whether the project has the potential for significant environmental effects. Minn. R. 4410.1700, subp. 7.B. "Cumulative potential effects" are environmental effects resulting "from the incremental effects of a project in addition to other projects in the environmentally relevant area" that may affect the same resources. Minn. R. 4410.0200, subp. 11a (2021). This criterion "put[s] the proposed project into context . . . to determine whether the project, which may not individually have the potential

---

[7] We acknowledge that no statute or rule requires an RGU, in the context of an EAW, to undertake the type of in-depth wildlife study that the DNR requests. But our decision is based on the city's failure to undertake *any* effort to identify the species that currently use or inhabit the project site itself. It is also based on the fact that the city's effort to identify species that currently use or inhabit adjacent Eagle Lake was minimal at best. On remand, we defer to the city to determine how best to identify the species that use or inhabit the project area. While the city may choose to conduct an in-depth wildlife study, we acknowledge that there may be other methods of identifying species short of an in-depth study that would allow the city to properly assess the "type, extent, and reversibility of environmental effects" on wildlife in the project area. Minn. R. 4410.1700, subp. 7.A.

to cause significant environmental effects, could have a significant effect" in light of other existing or future projects. *CARD*, 713 N.W.2d at 829.

In *CAMP I*, we concluded that the city's determination that the project would not have any significant cumulative effects was arbitrary and capricious because the city failed to address the project's potential for cumulative effects from GHG emissions. *CAMP I*, 2021 WL 1604359, at *1, 11. In response to our decision, the supplemental EAW includes a discussion of GHG emissions. The supplemental EAW estimates that the project would increase GHG emissions in the area by 35,221.87 MTCO2e per year. But the supplemental EAW's estimate does not include anticipated GHG emissions from visitors who arrive by plane, even though the project includes a "destination course," intentionally located near the Mankato Regional Airport.

The city's decision not to consider emissions from air travel appears to be based on the city's conclusion (set forth in its response to comments) that the project would not "have an impact on adjacent airplane . . . travel." There is no evidence in the record to support this conclusion. Indeed, the only relevant evidence in the record supports the contrary conclusion. The supplemental EAW explains that the project "needed to be near the Mankato Regional Airport" because it would be a "destination course." The only reasonable conclusion from this statement is that the project would increase regional air travel because at least some patrons would reach the project through the Mankato Regional Airport. By declining to consider how regional air travel to the project would affect the project's overall GHG emissions, the city "entirely fail[ed] to address an important aspect of the problem" and ignored evidence in the record. *Friends of Twin Lakes*, 764 N.W.2d

at 381. We therefore conclude that the city's analysis of the potential GHG emissions associated with the project is arbitrary, capricious, and not supported by substantial evidence.

In conclusion, because the city failed to adequately consider which species use or inhabit the project area and ignored an important source of GHG emissions from the project, the city's determination that the project does not have the potential for significant environmental effects is arbitrary, capricious, and not supported by substantial evidence. Accordingly, we conclude that the city's negative EIS declaration is arbitrary and capricious, and we reverse and remand for a new decision on the need for an EIS. We again express no opinion about whether an EIS is required.

**Reversed and remanded.**